IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ESTATE OF MARION DERKSEN, | : | |
|     Plaintiff | : | Civil Action No. 11-4549 |
|     v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
|     Defendant | : | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Rufe, J.                                                                                                              November 8, 2012

The Estate of Marion R. Derksen, through Lyn Bailey, executrix for and heir to the Estate of Marion R. Derksen (the "Estate"), has filed this action against the United States of America. The Complaint alleges that the Estate overpaid estate taxes to the Internal Revenue Service ("IRS") due to the IRS's disallowance of a valid debt, and seeks a refund of $103,326.09 for these allegedly overpaid estate taxes. The Estate also alleges that the IRS agreed to abate two months of late fees but did not do so, and now seeks reimbursement of the allegedly abated amount.

Defendant has filed a Motion to Dismiss or in the Alternative for Summary Judgment. Because both parties have completed discovery, and both parties rely on evidence beyond the pleadings, the Court will treat this as a Motion for Summary Judgment. For the reasons set forth herein, Defendant's Motion will be granted.

I.       **FACTUAL BACKGROUND**

In 1992, Marion and Willard Derkson, a married couple and the parents of Lyn Bailey, each had separate investment accounts with Merrill Lynch, as well as a joint investment account.[1]

---

[1] Bailey Dep. at 13-14 (Doc. No. 26, Ex. 101).

Mrs. Derkson successfully played the stock market as a hobby,[2] and her individual account was valued at over $400,000 in January 1992,[3] whereas Mr. Derkson's individual account was valued at approximately $25,000.[4]  Their joint account was worth approximately $175,000 in 1992.[5] During that year, Mrs. Derkson suffered several strokes, which resulted in short-term memory loss,[6] and Mrs. Derkson turned over management of her stock portfolio to Merrill Lynch.[7]  She also paid approximately $191,000 to live with her husband at Heron Point, a life care facility in Maryland.[8]

Despite this expense, her investment account continued to grow, and in April of 1994, Mrs. Derkson's individual account was valued at approximately $435,000.  At this time, the couple's joint account was worth approximately $260,000,[9] and Mr. Derkson's individual account was valued at approximately $27,000.[10]  In May 1994, the couple moved the assets in their joint account into Mr. Derkson's individual account, increasing the value of his account to approximately $290,000.[11]

---

[2] Doc. No. 26, Ex. 103.

[3] Doc. No. 26, Ex. 104.

[4] Doc. No. 26, Ex. 106; Pl. Aff'd at 3.

[5] Doc. No. 26, Ex. 110.

[6] Bailey Dep. at 7, 8; see also Doc. No. 26, Ex. 103.

[7] Doc. No. 26, Ex. 103.

[8] Bailey Aff'd. at (Doc. No. 30, Attachment 1).

[9] Doc. No. 26, Ex. 111, 113.

[10] Doc. No. 26, Ex. 112.

[11] Doc. No. 26, Ex. 112, 113.

Ms. Bailey has testified that her parents called her in the spring of 1994 after meeting with an attorney for the purpose of estate planning.[12]  During the conversation, Mr. Derkson mentioned to his daughter that they intended to keep their estates equal, and Mrs. Derkson agreed.[13]  Ms. Bailey testified that Mrs. Derkson would have agreed to such a plan because "[s]he did not like the estate tax" and would wish to "keep their estate tax as low as would be legitimate to do,"[14] and also because she generally considered and accepted her husband's suggestions.[15]  The Estate has admitted that there is no written evidence of an agreement between Mr. and Mrs. Derkson to maintain equal estates, and there is no evidence that the couple engaged in any negotiations before entering any such agreement.[16]  Ms. Bailey points to the transfer of assets from the couple's joint account into Mr. Derkson's individual account as evidence of a formal agreement to equalize their respective estates, supported by consideration.[17]  However, despite the transfer, there was still a fairly large discrepancy between the amounts in Mr. and Mrs. Derkson's accounts, and in any case, the transfer does not, by itself establish the existence of a formal agreement.  Ms. Bailey's testimony about the phone call from her parents remains the only evidence of an agreement to keep their estates equivalent in size.

In late 1996 or early 1997, Ms. Bailey reviewed her parents' trust account statements and

---

[12] Bailey Dep. at 17-8.

[13] Bailey Dep. at 17, 18.

[14] Bailey Dep. at 32.

[15] Bailey Dep. at 34, 35.

[16] Bailey Dep. at 18-19; Pl.'s Admissions (Doc. No. 26 Ex. 114).

[17] Pl.'s Ans. to Interrog. (Doc. No. 26, Ex. 115).

noticed that they were not equal in size.[18]  Mr. Derkson's account contained under $300,000,[19] and Mrs. Derkson's account contained over $500,000.[20]  Because the accounts were not equal, Ms. Bailey encouraged her mother to sign a $200,000 promissory note to Mr. Derkson, and drafted such a note for Mrs. Derkson to sign.[21]  She did not discuss this with Mr. Derkson, who was dying at the time.[22]  Mrs. Derkson signed the promissory note on April 16, 1997.[23]  Mr. Derkson died, on June 24, 1997.[24]  About nine months later, Ms. Bailey encouraged Mrs. Derkson to sign a $200,000 check payable to her husband's estate, which she did.[25]  The $200,000 promissory note was listed as a receivable on Mr. Derkson's state estate tax return.[26]  However, the $200,000 check was never deposited and the funds were never transferred into Mr. Derkson's estate.[27]  Mrs. Derkson was the heir to Mr. Derkson's estate in any event, and would have received the $200,000 back, free of federal estate taxation, once Mr. Derkson's estate was

---

[18] Bailey Dep. at 20-21.

[19] Doc. No. 26, Ex. 116.

[20] Doc. No. 26, Ex. 117.

[21] Bailey Dep. at 20-22; Pl.'s Admissions.

[22] Bailey Dep. at 23.

[23] Doc. No. 30, Ex. 7.  From Ms. Bailey's testimony, it appears that Mrs. Derkson, who suffered from severe short term memory problems after her stroke in 1992, may also have been incompetent at this time, although she was never adjudicated incompetent.

[24] Bailey Dep. at 17.

[25] Doc. No. 30, Ex. 8; Pl.'s Admissions.

[26] Doc. No. 26, Ex. 102.  No federal estate tax return was filed for Mr. Derkson.

[27] Bailey Dep. at 24-27; Pl.'s Admissions.

settled.[28]

Mrs. Derkson died on September 16, 2001, almost four years after her husband died. Her entire estate, which by that time included the assets she inherited from Mr. Derkson's estate, passed to Ms. Bailey, the couple's only child.[29] On August 23, 2002, the Estate filed an federal estate tax return which included a deduction for a $200,000 debt Mrs. Derkson allegedly owed to the estate of her late husband.[30] The IRS conducted an inquiry into the propriety of that deduction, during which Ms. Bailey informed the IRS that the debt was owed pursuant to agreement between Mr. and Mrs. Derkson to keep their estates equal in size, and a promissory note for $200,000 pursuant to that agreement which Mrs. Derkson signed prior to Mr. Derkson's death. The Internal Revenue Service ("IRS") disallowed a deduction for the $200,000 debt, citing lack of consideration for the agreement which created the debt. The Estate paid the IRS $103,326.09 based on the IRS's disallowance of the debt, but then challenged the disallowance. After exhausting administrative remedies, the Estate brought this suit to recover that amount, arguing that there was adequate consideration for the claimed debt.

---

[28] See Last Will and Testament of Willard L. Derksen (Doc. No. 30, Ex. 9). Although the Pennsylvania state tax return filed for Mr. Derkson's estate (Doc. No. 30, Ex. 17) indicates that Mrs. Derkson only inherited a life estate interest in Mr. Derkson's trust estate, the terms of the Trust Agreement established by Mr. Derkson provided that upon his death, after a payment of $100,000 to Lyn Bailey, the remainder of his assets would be divided into Share A and Trust B. Share A would contain all assets of the trust estate "having a value equal to the maximum marital deduction" under federal estate tax law. The balance of his assets would be placed in Trust B, in which Mrs. Derkson would have a life estate interest. See Trust Agreement (Doc. No. 30, Ex. 10). It appears that at the time of Mr. Derkson's death in 1997, under the Economic Recovery Tax Act of 1981 (PL 97-34), no federal estate taxes were due for marital transfers of any amount upon the death of a spouse. Therefore, all of Mr. Derkson's assets would be designated Share A, which would be "paid over and distributed to the Settlor's wife free of trust."

[29] Doc. No. 30, Ex. 11.

[30] Doc. No. 26, Ex. 120.

5

The parties agree that the Estate filed its estate tax return more than two months late.[31] Accordingly, the IRS assessed penalties against the estate for late filing and late payment. On December 3, 2002, the Estate requested a partial or full abatement of the penalties.[32] In February 2004, before receiving a ruling on the abatement request, the Estate paid $8,115 to cover the full penalty. A two month abatement of penalties was offered by IRS Estate Tax Attorney Penelope Green, in a letter dated December 2, 2004 (the "Letter").[33]

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if "the materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[34] Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[35] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[36] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[37]

In evaluating a summary judgment motion, a court "must view the facts in the light most

---

[31] Doc. No. 30, Ex. 1 and 3.

[32] Doc. No. 30, Ex. 1.

[33] Doc. No. 30, Ex. 3.

[34] Fed. R. Civ. P. 56(a), (c)(1).

[35] Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

[36] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[37] Id.

favorable to the non-moving party," and make every reasonable inference in that party's favor.[38] Further, a court may not weigh the evidence or make credibility determinations.[39]  Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[40]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[41]  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[42]  Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[43]

### III.    DISCUSSION

#### A.    The Claimed Debt is Not Deductible Under Section 2053.

Section 2053 of the federal tax code authorizes a deduction for claims against or debts of an estate.  If the claim is based upon a promise to pay, the estate must show that there was a bona fide contract, promise or agreement made in exchange for adequate financial consideration,[44] and demonstrate that the claim was an enforceable obligation that existed on the date of the

---

[38]  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

[39]  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

[40]  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[41]  Anderson, 477 U.S. at 249-50 (citations omitted).

[42]  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

[43]  Celotex, 477 U.S. at 322; Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

[44]  26 U.S.C. § 2053(c)(1) (claim must be "contracted bona fide and for an adequate and full consideration in money or money's worth").

decedent's death.[45]  Generally, deductible claims must actually be paid by the estate.[46]  If an estate does not meet this burden of establishing that it is entitled to a deduction under Section 2053, the claim is not deductible from federal estate taxes.

    Defendant argues that the Estate cannot demonstrate that a bona fide agreement was made in exchange for adequate monetary consideration.  "One purpose of the consideration provisions of section 2053 is to prevent the depletion of the estate for estate tax purposes by transfers couched in contractual form but serving a donative intent."[47]  The Estate presents no evidence that Mrs. Derkson contracted for consideration.  In fact, as Mrs. Derkson had significantly more wealth than her husband, any agreement to equalize their investment accounts (and ultimately their estates) would have required her to transfer her own money to her husband.  There is no evidence that she received any value, rights or privileges in return, nor is there evidence that she considered this transfer to be a loan and intended to seek repayment.  The evidence the Estate points to (e.g. a change in which account money was drawn from to pay expenses and fund gifts, opening trust accounts, moving money from a joint account into an individual account) does indicate that the Derksons were jointly engaged in estate planning with the intent of creating more equivalent estates; however, the evidence does not suggest an agreement to maintain equal estates which was *supported by financial consideration*.

    Agreements between family members are viewed with particular scrutiny, even when

---

[45] 26 C.F.R. § 20.2053-4(a).

[46] Id.

[47] Bank of New York v. United States, 526 F.2d 1012, 1016 (3d Cir. 1975).

supported by monetary consideration.[48]  "[A]ny contract between a decedent and someone who would be a natural object of his or her bounty is viewed with suspicion, requiring exceptional circumstances to be treated as something other than simply an agreement to make a testamentary disposition to persons who are the natural objects of one's bounty."[49]  In determining whether family members entered into bona fide agreement, the following factors are indicative of a genuinely contractual arrangement:

> (A) The transaction underlying the claim or expense occurs in the ordinary course of business, is negotiated at arm's length, and is free from donative intent.
> (B) The nature of the claim or expense is not related to an expectation or claim of inheritance.
> (C) The claim or expense originates pursuant to an agreement between the decedent and the family member, related entity, or beneficiary, and the agreement is substantiated with contemporaneous evidence.
> (D) Performance by the claimant is pursuant to the terms of an agreement between the decedent and the family member, related entity, or beneficiary and the performance and the agreement can be substantiated.
> (E) All amounts paid in satisfaction or settlement of a claim or expense are reported by each party for Federal income and employment tax purposes, to the extent appropriate, in a manner that is consistent with the reported nature of the claim or expense.[50]

Here, there is no evidence that any agreement between Mr. and Mrs. Derkson to maintain equal estates arose in the ordinary course of business, as the facts demonstrate that the parties had only a marital and not also a business relationship.[51]  There is also no evidence that Mr. and Mrs.

---

[48] Bank of New York, 526 F.2d at 1016.

[49] Estate of Shapiro v. United States, 634 F.3d 1055, 1062 (9th Cir. 2011) (internal quotations omitted).

[50] 26 C.F.R. § 20.2053-1(b)(2)(ii).

[51] Cf. 26 C.F.R. §20.2053-1(b)(4) (Ex. 3), describing a bona fide claim by a family member where a niece, who was a CPA, provided decedent with accounting and bookkeeping services for three years prior to his death, and presented itemized monthly bills for services rendered, some of which were not paid prior to decedent's death.  The regulations note that in this hypothetical example, the claim arose in the ordinary course of business, as the niece provided similar services for similar fees to unrelated clients, the billing records and payment history constituted contemporaneous evidence of a bona fide business agreement, and the fees charged appeared to be negotiated at

Derkson ever engaged in arms-length negotiation or bargaining during their estate planning. Generally, "the value of the claim settled by the estate may not be deducted if the agreement on which the claim was based was not bargained at arm's length."[52] Where "friendly spouses" are "of one mind" when they execute their mutual wills to advance a collective interest, the Third Circuit has found no evidence of arm's length bargaining.[53] The evidence before the Court shows that any plan Mr. and Mrs. Derkson made to keep their estates equal was made mutually, for the purpose of minimizing estate tax liability when their heirs ultimately inherited, and any promise to transfer funds was made pursuant to a friendly agreement between spouses to keep their estates equal. Therefore, the claim that the Estate was entitled to a deduction for an alleged debt to the estate of Mr. Derkson fails on this point.[54]

The tax regulations also direct the Court to examine whether a debt or expense for which a deduction is sought served a donative intent or was related to an expectation or claim of inheritance.[55] Here, a husband and wife apparently entered into a cooperative plan to pass on their assets to their heir in a manner which minimized estate tax liability and thus maximized the assets passed on to their heir. The Court therefore concludes the agreement served a donative

---

arms-length, as they were consistent with fees the niece charged for similar services to unrelated clients.

[52] Bank of New York, 526 F.2d at 1016.

[53] Id. at 1017 ("It would appear that Mr. and Mrs. Rionda were of one mind when they made their mutual wills; they agreed that the estate of the first to die should go to the survivor and then to certain specified legatees. . . . There is nothing in the record to support a finding that the mutual wills here were executed as the result of an arm's length bargain of any sort.")

[54] Id. ("This Court has adhered to the distinction between family arrangements bargained for at arm's length and family arrangements that reflect a community of interests. Tax advantages are not permitted when an agreement between members of a family could be regarded as a cooperative attempt to make a testamentary disposition rather than as an arm's length bargain.")

[55] 26 C.F.R. § 20.2053-1(b).

intent and was related to an expectation of inheritance.

The Estate's claim also suffers from the absence of any contemporaneous evidence to substantiate the alleged agreement between the parents.[56]  There is no evidence that the decedents entered into a written agreement, and the only evidence that an oral agreement existed is Ms. Bailey's recollection of a 1994 telephone call in which her father noted the Derksons' intent to keep their estates equal, and her mother agreed.  The Government correctly notes that there is no evidence that Mr. or Mrs. Derkson asked Ms. Bailey to enforce this plan.  Although the Derksons had accountants managing their investment accounts and paying their bills in the years between this conversation and their deaths, there is no evidence that their accountants were advised of any agreement or instructed to manage the accounts and bills so as to maintain equal investment accounts.  Other than the transfer of funds from a joint account into Mr. Derkson's individual account in 1994,[57] and some trust funds set up for the education of the Derksons' grandchildren around the same time, the Derksons did not engage in ongoing efforts to equalize their accounts. The Estate's claim—that Mrs. Derkson owed Mr. Derkson $200,000 pursuant to an agreement to keep their estates equal in size—was not enforced by either decedent during their lifetimes or by Mrs. Derkson after her husband's death.  The $200,000 at issue was never transferred to Mr. Derkson's estate.  The Court finds no contemporaneous evidence to support an agreement warranting the $200,000 estate tax deduction Ms. Bailey claimed after inheriting the balance of

---

[56] 26 C.F.R. §20.2053-1(b)(ii)(C).

[57] Even with the transfer of funds, Mr. and Mrs. Derkson's account balances differed by over $100,000 at that time.

both estates upon Mrs. Derkson's death.[58]

With regard to consistent reporting for tax purposes, Ms. Bailey did, as executrix, claim the $200,000 as an asset on Mr. Derkson's Pennsylvania estate tax return. Presumably, she would have listed it as an asset on a federal estate tax return as well, had one been required. However, the funds were never deposited into Mr. Derkson's estate. When Mrs. Derkson died, four years later, Ms. Bailey, as executrix, listed the $200,000 as a debt against Mrs. Derkson's estate on the decedent's federal estate tax return. This consistent reporting evidences only Ms. Bailey's belief that it was the intent of her parents to equalize their estates. It is insufficient in this case to outweigh the evidence that Mr. and Mrs. Derkson did not enter into a bona fide contract, promise or agreement made in exchange for adequate financial consideration, especially given the undisputed fact that the funds were never transferred.

> B. The Estate is Not Entitled to an Abatement of Penalties and Interest for Late Payment

The Estate also seeks a refund for two of the three months-worth of penalties paid, arguing that the IRS had agreed to abate the penalties but has failed to issue a refund. The Government argues that no agreement to abate penalties was reached, and no refund is due.

The Government argues that while Sections 7121 and 7122 of the Internal Revenue Code allow the Government to enter into a written settlement agreement regarding a taxpayer's liability,[59] the IRS is not bound by agreements which do not comply with the formalities

---

[58] It is undisputed that Ms. Bailey would ultimately inherit the $200,000 at issue, whether it was originally part of Mr. Derkson's estate or Mrs. Derkson's estate.

[59] 26 U.S.C. §§ 7121(a), 7122(a).

Congress requires, including authorization from the Secretary of the Treasury.[60]  The Government further argues that the Secretary of the Treasury did not endorse a binding closing agreement regarding the Estate's request for an abatement of late penalties in this case.  The Estate does not put forth any evidence demonstrating that it executed the documents that the IRS indicated were needed to create a formal closing agreement.

Some courts have held that an informal agreement between the IRS and a taxpayer, even if not endorsed by the Secretary, may in some circumstances become binding on the parties by equitable estoppel when executed.[61]  Therefore, the relevant questions here are: 1) whether the Letter noting that the IRS would grant a two-month abatement of penalties created an agreement between the parties; and 2) if, there was an agreement, whether it was executed in a manner which raises issues of equitable estoppel.

The Estate argues that Ms. Bailey's December 3, 2002 letter requesting an abatement was an offer, and that Ms. Green's December 2, 2004 Letter on behalf of the IRS was an acceptance.  The Court disagrees.  Ms. Bailey's letter reads: "I wish to have [the assessment of penalties and interest] reduced by the entire amount, or at least one month, and believe that my reasons are acceptable."  She then described the advice she had received from an accountant which had caused the late filing.  This letter asks the IRS to consider her request for an abatement and the reasons she believes one is warranted.  It does not constitute an offer.

The IRS Letter did offer a two month abatement of penalties.  It also informed Ms.

---

[60] Botany Worsted Mills v. United States, 278 U.S. 282, 288-89 (1929); Aronsohn v. United States, No. 91-1440, 1992 WL 237323, at *5 (M.D. Pa. June 17, 1992).

[61] Aronsohn at *5 (citing cases).

Bailey, as Executrix of the Estate, that the IRS was disallowing the $200,000 deduction for the debt to Mr. Derkson.[62] The Letter advised:

> "I have enclosed the Waiver (form 890) which states the deficiency and penalty amount due and payable. If you agree with the adjustments, sign the Waiver and return it to my attention, no later than December 22, 2004. A check or money order for the deficiency amount should accompany the Waiver to stop the accrual of the interest. . . . Once I have received these documents duly executed the estate will receive a federal estate tax closing letter. . . . If you disagree with the adjustments, contact me immediately so that we can discuss how you would like to proceed."

Ms. Bailey did not sign and return the waiver, did not pay the deficiency by December 22, 2004, and did not timely contact Ms. Green to indicate any disagreements about the adjustments set forth in the Letter.

Plaintiff makes much of the fact that the waiver form the IRS provided for her signature did not offer her the opportunity to accept only the abatement, and not the disposition of the deficiency issue. However, Plaintiff puts forth no evidence that she contacted the IRS to discuss her agreement or disagreement with either issue, so there is no way of knowing whether the IRS would have entered into an agreement as to the abatement without a waiver on the deficiency issue.

The Court finds no evidence that the Estate timely accepted any terms set forth in the Letter. In fact, the Estate did not correspond with the IRS again until ten months later, on October 7, 2005, when Ms. Bailey sent a letter to the IRS indicating her belief that the Letter entitled her to an abatement.[63] Given the plain language of the IRS's Letter, which required

---

[62] Id.

[63] Doc. No. 30, Ex. 4.

signed waivers by December 22, 2004, or "immediate" communication with the IRS if a dispute remained, and noting that it is clear from the Letter that the IRS had found that the Estate was not entitled to an abatement as a matter of law,[64] but issued a *time-limited* abatement offer in an attempt to settle the tax disputes in spite of this adverse finding, the Court cannot view the Estate's December 7, 2005 letter as an acceptance of the abatement offered ten months earlier.

The Court further finds that neither the exchanged letters nor the financial transactions between the IRS and the Estate raise issues of equitable estoppel. The Estate paid unabated penalties for late filing of the return prior to the issuance of the Letter offering a two month abatement. Therefore, the Estate did not incur additional late fees, penalties, or interest due to underpayment of those penalties in reliance on the letter. Accordingly, the Court finds that the Government did not enter into a binding agreement to abate the penalties charged for late filing of the Estate's tax return, and principles of collateral estoppel do not apply.

## IV.     CONCLUSION

For the reasons set forth above, the Government's Motion for Summary Judgment will be granted. An appropriate Order follows.

---

[64] "Your reliance on the practitioner who prepared and filed the return is not in accordance with the "reasonable cause" exception of the Internal Revenue Code § 6651(a) that would allow a full or partial abatement . . . . In spite of this I will grant a two month abatement of each penalty." Doc. No. 30, Ex. 3.